760 So.2d 845 (2000)
Donald McCORKLE and Mack H. McCorkle, Jr., Appellants,
v.
LOUMISS TIMBER COMPANY, W.B. Netterville, Foster Creek Corporation, Timberland Management Services, Inc., K & J Logging, Inc. and J & N Timber, Inc., Appellees.
No. 1999-CA-01000-COA.
Court of Appeals of Mississippi.
May 30, 2000.
*847 Samuel P. Westmoreland, Hattiesburg, Attorney for Appellants.
David N. Wilkerson, Woodville, Gene Horne, Centreville, Attorneys for Appellees.
BEFORE SOUTHWICK, P.J., BRIDGES, AND IRVING, JJ.
SOUTHWICK, P.J., for the Court:
¶ 1. In earlier litigation, a father brought suit against his adult children to have a recorded option agreement removed as a cloud on his title to certain real property. The final judgment upheld the option and required the father to permit its exercise. Before that judgment was entered, two of the children brought this damage action against companies who had cut timber on this same land and paid only the father. The timber had been cut almost a year before the purchase option was exercised. The chancery court dismissed the complaint, finding a failure to state a claim, lack of standing and no cause of action. On appeal the sons allege error. We agree in part, as we find that the claim of tortious interference with a contract was sufficient to withstand the motion for dismissal. However, the rest of the present action is barred by the final and unappealed judgment in the earlier litigation. We thus affirm the dismissal of all other claims.

FACTS
¶ 2. Mack H. McCorkle, Sr., the father of the appellants, owned property in Amite County. In early 1994, Mr. McCorkle, Sr., decided to sell the timber growing on his land. He hired Timberland Management Services, Inc., to cruise the property and provide an estimate of the value of the timber. According to affidavits in the record, Timberland did nothing beyond what was necessary to provide the estimate and was not involved in the actual timber cutting.
*848 ¶ 3. After receiving the estimate, Mr. McCorkle, Sr., sold the timber to W.B. Netterville. Defendant LouMiss Timber Company stated in discovery that it provided the funds that Netterville used for the purchase. These two defendants state that they and their agents cut and removed the timber. The role of other defendants is unclear. J & N Timber, Inc., filed an answer denying all allegations, apparently including the general allegation that it had any connection to this timber cutting. Foster Creek Corporation never appeared and an entry of default was made by the chancery clerk; no default judgment was ever granted. K & J Logging apparently was never served. Of the four defendants participating in the suit, Netterville, LouMiss, and J & N are all represented by the same counsel, while Timberland is separately represented.
¶ 4. Mr. McCorkle, Sr., was paid approximately $150,000 for the harvested timber. The timber cutting began in mid-May 1994 and was finished one month later.
¶ 5. On March 17, 1994, which was prior to the cutting and perhaps was prior to Mr. McCorkle, Sr.'s contact with Timberland to cruise the timber, two of Mr. McCorkle, Sr.'s sons filed an April 5, 1972, "Agreement" among the deed records of Amite County. As will be described, the ambiguous Agreement was between the father and his sons James McCorkle, who died in about 1977, and the appellant Mack McCorkle, Jr. James McCorkle was found to have been given the right under the 1972 Agreement to purchase a 100/215 interest in the property for $30,000, while Mack McCorkle, Jr., was found to have a right to purchase a 115/215 interest for $35,000. After this suit began, Mack McCorkle, Jr., assigned his right to his brother Donald. The sons' view is that the Agreement was notice that they had an ownership interest in the property. Mr. McCorkle, Sr., filed suit to cancel the agreement as a cloud on his title. The defendants were Donald and Mack McCorkle, Jr., as well as the other heirs of the deceased brother James, who appear to be other brothers and a sister. The answer asserted that the defendants owned the property. They counter-claimed against their father for the wrongful cutting of timber. The defendants, including the two brothers who are parties here, sought an accounting of the value of the timber removed, and actual and statutory damages.
¶ 6. This earlier litigation between the father and his children went to trial in April 1995, long after the timber cutting at issue on this appeal was completed. The chancellor held that the Agreement gave the promisees, James and Mack McCorkle, Jr., no present interest in the land but gave them a right to purchase an interest by tendering the price established in the Agreement. The Agreement also permitted a life estate to be retained by Mr. McCorkle, Sr. In the judgment, the heirs of James McCorkle were given 90 days to exercise the option to purchase the 100/215 interest to which he had been entitled, or else the right of purchase would terminate. The counterclaim was dismissed with prejudice on May 25, 1995, and no appeal was taken. It is now a final judgment.
¶ 7. There is no assertion nor evidence that the right that James McCorkle had under the 1972 Agreement to purchase a 100/215 interest in the subject property has ever been exercised. If not, then that right has expired. The purchase price for the 115/215 interest in the property was tendered, but Mr. McCorkle, Sr., would not execute a deed. After a court order, the interest was deeded by the chancery clerk to Mack McCorkle, Jr., on February 15, 1996, reserving to Mack McCorkle, Sr., a life estate. This remainder interest in turn was conveyed by Mack, Jr., to Donald McCorkle.
¶ 8. Of significance to the present litigation, the judgment in the earlier suit dismissed the counterclaim brought by Donald and Mack McCorkle, Jr., that had sought damages from their father for the timber cutting. They asked for an accounting for all the money that their father *849 had acquired and a judgment for all timber taken. They also claimed statutory damages for the trespass and punitive damages for their father's "wilful and malicious failure" to pay them for the timber. In the May 1995 judgment on the first suit, the chancellor dismissed that counterclaim with prejudice. The reason was that the 1972 Agreement was "prospective in nature."
¶ 9. On March 16, 1995, Donald and Mack McCorkle, Jr., filed suit only against LouMiss Timber Company alleging wrongful cutting of the timber located on Mr. McCorkle, Sr.'s property. Thus this suit was filed before the prior suit went to trial. The remaining parties were added through two amended complaints. All of the defendants moved for summary judgment citing the May 25, 1995 judgment as a basis for application of the doctrines of res judicata and collateral estoppel.
¶ 10. On May 11, 1999, the chancellor rejected the grounds of res judicata and collateral estoppel. However, the chancellor found that the sons had failed to state a claim upon which relief could be granted and that they lacked standing to sue. Both decisions were based on the revelations in their own pleadings that they did not have any interest in the land and timber until after the timber had been cut. The complaint was dismissed with prejudice. The trial court specifically cited its May 25, 1995 judgment as a basis for dismissing the complaint, a judgment attached as an exhibit to the complaint. It is from this order dismissing their complaint that the McCorkle sons appeal.

DISCUSSION
¶ 11. The McCorkle sons assert that the trial court used the doctrines of res judicata and collateral estoppel as the basis for dismissing their complaint despite the court's assertion that it was not. They then allege that the application of these doctrines was erroneous. The chancellor in his order specifically stated that the res judicata and collateral estoppel did not apply to this case because there was no identity of parties. Whether deep in the recesses of the chancellor's mind he truly believed that res judicata or collateral estoppel actually applied is not a productive inquiry. What we will review is whether the grounds explicitly named by the chancellor uphold the result. Only if we conclude that the chancellor erred in his legal analysis would we consider other possible bases to uphold the judgment.

I. Judgment on the Pleadings
¶ 12. The chancellor dismissed the complaint because of a failure to state a claim on which relief may be granted. Civil Rules 12(b)(6) and 12(c) serve similar functions of testing the legal sufficiency of the plaintiff's allegations. M.R.C.P. 12(b)(6) & 12(c); Holland v. Kennedy, 548 So.2d 982, 984 n. 3 (Miss.1989). We are presented with a question of law that we review de novo. City of Tupelo v. Martin, 747 So.2d 822, 829 (Miss.1999).
¶ 13. Rule 12(c) states that "after the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. If... matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment...." M.R.C.P. 12(c). The motion was not granted until all pleadings were filed, and there is no evidence that the chancellor considered any matters outside the pleadings. Thus Rule 12(c) was an appropriate instrument to use. Whether it was used properly is what we must decide.
¶ 14. The McCorkle sons' second amended complaint asserts that the appellees wrongfully cut timber on the subject property from May 1994 through August 1994. The complaint also incorporates the May 25, 1995 judgment which on its face declared that the McCorkle sons did not have an interest in this property until such time as they tendered the purchase price for the land in accordance with the terms of *850 the Agreement. This amended complaint asserts that the purchase price was not tendered to Mr. McCorkle, Sr., until August 1995.
¶ 15. Thus the plaintiffs' own pleadings agree that they had only the right to purchase an interest in the property at the time of the timber cutting and that they did not tender the purchase price to their father until the year after the timber was cut. They also acknowledge in their pleadings that their claims against their father for compensation regarding the timber were dismissed with prejudice. The plaintiffs must assert a cause of action that is viable against these defendants on these asserted facts.
¶ 16. The second amended complaint presents these five claims:
1) Tortious interference by the timber companies with their contract with their father;
2) Waste to their interests caused by the taking of the timber;
3) Negligence by the timber companies in failing to make a careful review of the land deed records, which would have led to the discovery of their contract of purchase;
4) Wrongful timber cutting resulting from a trespass, and statutory damages under Miss.Code Ann. § 95-5-10; and
5) Conversion of the timber after cutting.
¶ 17. For all but the first claim of interference with the contract with their father, the causes of action turn on two legal points. The first is whether someone who has an option, but has not yet purchased real property, must give consent before timber can be cut. The second key point is regardless of the merits of the claim, whether the dismissal of the two sons' counterclaim against their father bars this suit as well. The trial court rejected the second point. We defer it.

A. Rights of owner of option
¶ 18. The Agreement did not expressly limit the father's use of the land until the purchase. The 1972 Agreement is an exhibit to the Complaint and thus could be considered on a motion for judgment on the pleadings. It is facially ambiguous as to whether the sons had an interest for which they already paid in 1972 or whether there was simply an agreement that they could later purchase. In the earlier suit, the chancellor found that it was an agreement to sell should the sons tender the $65,000 that was the purchase price. No money was tendered until after the May 1995 judgment, long after the timber was cut. The May 1995 judgment also was attached to the complaint. Therefore if there was a necessity that the sons agree to the timber cutting, that necessity arises from general legal principles and not specific contractual terms.
¶ 19. We first identify the character of this Agreement. The chancellor in his May 1995 judgment enforced it but did not categorize it. The chancellor found that the Agreement granted rights to Mack McCorkle, Jr., and James McCorkle, that could be exercised by the tendering of the specific price of $65,000. He also found that until the money was tendered, they had no interest in the property. The chancellor held that when James McCorkle died in about 1977, his heirs succeeded to his rights in the Agreement. An agreement to sell land for a definite price, exercisable at the discretion of the promisee, is an option contract. Duke v. Whatley, 580 So.2d 1267, 1272 (Miss.1991).
¶ 20. The McCorkle agreement was not the most complete option contract ever entered, as it contained no definite time period and does not indicate whether consideration was paid for the option. Id. at 1272-73. Absent consideration, an option agreement is little more than an offer, revocable at will if that was done prior to acceptance by the promisee. Bancroft v. Martin, 144 Miss. 384, 109 So. 859, 860 *851 (1926). Still, a finding that an agreement is sufficiently definite to carry out the reasonable intention of the parties is favored. Busching v. Griffin, 542 So.2d 860, 863 (Miss.1989). In the first suit the chancellor obviously found this to be sufficiently definite and still to be in effect. The reasonableness of that decision is not before us, as no appeal was taken.
¶ 21. The McCorkle sons argue that the option gave them a compensable interest when the timber was cut. One of the cases cited for the proposition actually found that the purchaser of an option did not have a compensable interest in an eminent domain action because the option had expired; it never reached the question of whether a current option would entitle the holder to compensation. Hennessey v. Wilson, 225 Miss. 366, 369-70, 83 So.2d 176, 177 (1955). The other cited precedent determined that a letter from the landowner had not created an enforceable option. Comstock Brothers v. North, 88 Miss. 754, 41 So. 374, 376 (1906).
¶ 22. Though the cited case law is unhelpful, the supreme court has in effect held that an option is an interest in land, since it is subject to the rule against perpetuities which only applies to interests in land. Pace v. Culpepper, 347 So.2d 1313, 1316 (Miss.1977). Even though there is considerable division among the states that have considered the issue, categorizing this as an interest in land may not even matter. ERIC MILLS HOLMES (ED.), CORBIN ON CONTRACTS 591-92 (1996) § 11.16. What is important is that contractually the grantor of the option must "not repudiate or make performance impossible or more difficult by conveying the land to a third person. These rights are enforceable by all the usual judicial remedies," including damages and specific performance. Id. at 592.
¶ 23. In view of the foregoing, it seems very clear that the option holder should also have rights against third persons, to the effect that third persons shall not interfere with performance by the promisor by contracting with the promisor or by accepting from the promisor a deed of conveyance in breach of the promisor's duty to the option holder.
Id. at 593. Once an option contract is properly recorded, it stands as constructive notice to all who would deal with the promisor's land. Id. at 596. Therefore, third parties could have dealt with Mr. McCorkle, Sr., from 1972 until recordation of the Agreement in 1994 without being affected by the option unless they had actual knowledge of it. Once the option was filed, third parties were on notice of some claim by the sons. A later court order found the right to be an option to purchase. Even in those states that do not treat an option to purchase land as an interest in real property, "it does give rise to an inchoate interest" that can be protected in equity. GEORGE W. THOMPSON, COMMENTARIES ON THE MODERN LAW OF REAL PROPERTY 266 § 4444 (1963).
¶ 24. It appears beyond dispute that once the Agreement was placed on record, a third party could not purchase that property from Mr. McCorkle, Sr., without the purchase having to address the rights of the sons. There is authority that if a third party wishes to purchase, the optionee must be notified and agree to exercise his option or else the option is forfeited. RESTATEMENT (SECOND) OF PROPERTY § 37, illustration 2. We find that to be reasonable if there is no time limit on the exercise of the option and no consideration has been paid. See Bancroft v. Martin, 109 So. at 860. Had the defendant timber companies offered to buy the entire fee simple title to this property, the McCorkle sons could have been put to the test of exercising their option. If they failed to do so, the sale to the third parties could occur. Here two of the McCorkle sons wanted to purchase.
¶ 25. If the same rule applies to purchase of timber alone, then there may be a claim in this case. The precedent closest factually, but not close enough, involved a landowner who sold the property but had the right to remain in possession for a few *852 months. During those few months he sold the timber, which the supreme court held he had no right to do. Smith v. Forbes, 89 Miss. 141, 42 So. 382 (1906). Certainly the fact that the person purporting to sell the timber had already conveyed the land and therefore the timber was controlling. The promisor in an option contract might never sell the land to the optionees, making this an entirely different situation.
¶ 26. What we find disposes of the issue is that growing timber is an interest in real property. South Mississippi Elec. Power Ass'n v. J.F. Miller Timber Co., Inc., 314 So.2d 346, 348 (Miss. 1975). To sell the timber in place so that someone may enter and cut it, is to convey some of the land. The holders of the option had the right to buy the land with the timber still on it just as they had the right to the land itself. To sell the timber to a third party requires the same initial contact and offer to the optionees as would selling the entire property or the mineral interests.
¶ 27. To give perspective about timber, we note that Mr. McCorkle, Sr., was not barred from planting and harvesting crops, or contracting with someone else to harvest and sell the crops. A life tenant, for example, does not have to account to remaindermen for profits from crops because the perennial nature of crops, and the loss of value if they are not harvested, means no waste to the estate occurs from growing crops. Such action is necessary for "good husbandry." See Threatt v. Rushing, 361 So.2d 329, 331 (Miss.1978). Timber is a different story. A life tenant may harvest the timber over a remainderman's objection only in these circumstances: "(a) when necessary to raise funds to pay the taxes on the property, (b) to provide timber for repair of fences and other improvements on the property, and (c) such harvesting as is indicated in the proper management and preservation of the property." Twin States Land & Timber Company, Inc. v. Chapman, 750 So.2d 567, 570-71 (Miss.Ct. App.1999) (citing Threatt). On the other hand, if the timber cutting is for general purposes not involved with maintaining and preserving the value of the estate, the cutting that is authorized only by the life tenant can be enjoined. Threatt, 361 So.2d at 331.
¶ 28. Though the holder of an option is not in the same legal relationship with the promisor as a remainderman is to a life tenant, some of the same equitable obligations exist. The need to avoid substantial reduction in the value of the property applies in both situations.
¶ 29. The most inequitable part of the present case from the perspective both of Mr. McCorkle, Sr., and the timber companies, may arise from the age of the option. For two-plus decades the matter was ignored insofar as this record reflects. However, the chancellor in the first suit regarding the validity of that Agreement determined it to be enforceable even in 1995. Once that became a final, unappealed decision, it binds the McCorkles. Consider a less aged option agreement. Had the McCorkle sons in 1994 entered an option to purchase their father's timber land and set the value in the agreement based on its current market value, that agreement could have been recorded. Had the father a week later and prior to the exercise of the option contracted to sell the timber to third parties, greatly reducing the land's value, would the sons have no right to complain? If they could not, would they still have to pay the original price set out in the option? Surely not, and if not then the promisor by his unilateral act has made the option contract terms unenforceable.
¶ 30. Though the hypothetical has little to do with the facts of the present case, it has everything to do with the necessary legal analysis. Once the 1972 option Agreement was found still to be enforceable, there is no reason in law for it to have a different effect on the rights of the *853 parties than would a more recently executed agreement.
¶ 31. We hold that the McCorkle sons have some rights that may be asserted in this litigation. We need now to decide whether all of their many claims are viable or whether the chancellor was correct at least in dismissing some of them. We return to our earlier list of five claims.
1) Tortious interference by the timber companies with the contract with their father. There is little in the pleadings to flesh out this claim. Perhaps the sons are claiming that the timber companies had some role in their father's reluctance and outright refusal to uphold the Agreement. We know little of this on this record, but also find nothing in the pleadings justifying its dismissal for failure to be an adequate claim.
2) Waste to their interests caused by the taking of the timber. This indeed is the claim that we recognize. Having found that the Agreement was constructive notice, we also have found that the sons had either to agree to the cutting of the timber or if not, they had to be required to choose to buy the land at that time or else forfeit their option rights. Those steps were not taken.
We distinguish the result had this timber cutting been a trespass against Mr. McCorkle, Sr.'s interests. Subsequent owners of the fee who did not have at the time of the cutting any cognizable interest do not succeed to a right to sue for the trespass absent a specific assignment of that claim. J.H. Leavenworth & Son v. Hunter, 150 Miss. 750, 755-56, 117 So. 122, 123 (1928).
3) Negligence by the timber companies in failing to make a careful review of the land deed records, which would have led to the discovery of their contract of purchase. We do not find this to be an independent cause of action. The option Agreement was of record and therefore constructive notice. Negligence is irrelevant. In fact, the pleadings allege that at least some of the defendants had actual notice of the option agreement.
4) Wrongful timber cutting resulting from a trespass, and statutory damages under Miss.Code Ann. § 95-5-10. This statute is highly penal and is to be applied only in the clearest of cases. Twin States Land & Timber, 750 So.2d at 570. In that case, the Court held that a remainderman was not entitled to the statutory damages for timber cutting that had been authorized only by the life tenant; instead he would be limited to damages for waste. Id. That interpretation applies here. Ultimately the chancellor in the first suit found that James and Mack McCorkle, Jr., had only been conveyed an option to purchase a remainder interest in this property. The owner of the fee, Mack McCorkle, Sr., who was subject to the possible exercise of this option that would leave him with only a life estate, granted the right to cut the timber. The right to purchase a remainder interest is even less concrete than was the plaintiff's interest in Twin States.
¶ 32. Further, since it appears that the plaintiffs purchased only a 115/215 remainder interest and the father not only owns the life estate but has the complete title to the other 100/215, this invokes the principle that statutory damages are inappropriate when a cotenant has authorized the timber cutting. Bollinger-Franklin Lumber Co. v. Tullos, 124 Miss. 855, 859, 87 So. 486, 486 (1921).
¶ 33. Consequently we hold that no statutory damages for the timber cutting may be imposed.
5) Conversion of the timber after cutting. This also adds nothing to the concept of waste. Damages for waste to the option owner's interests are based on the idea that the timber cutter has converted the standing timber into personalty as well as converted it to his own use. Learned v. Ogden, 80 Miss. 769, 32 So. 278 (1902) *854 (cited in Twin States Land & Timber, 750 So.2d at 571).
¶ 34. In summary, the first two claims tortious interference with a contract and the waste caused by the cutting of the timbercan be asserted by the owners of an option. Since the McCorkle sons have exercised their rights under the option, whether they were willing to do so is now moot.

B. Res judicata effect of dismissal of claims against Mack McCorkle, Sr.
¶ 35. Even if the two McCorkle sons were to present facts sufficient to prove that their legal interests were damaged by the timber cutting, they also must show that the earlier dismissal of their claims against their father for the same damages does not bar them in the present suit. As will be recalled, the May 1995 judgment in the suit brought by their father also resulted in a dismissal with prejudice of their counterclaim for damages arising from his sale of this same timber. The judgment was that the seller of the timbertheir fatherwas not liable to the McCorkle sons. The present suit attempts to receive damages from those who bought that timber from their father.
¶ 36. What the chancellor specifically found is that Mr. McCorkle, Sr., had in early 1994 the right to sell his timber without sharing any of the proceeds with his sons. That final judgment, from which no appeal was taken, binds all three parties to that suit. May the sons nonetheless bring this suit and say that these defendants had no right to buy, even though their father has been found conclusively to have the right to sell?
¶ 37. Answering that question takes us to the legal issue that the chancellor rejected, namely the twin concepts of res judicata and collateral estoppel. The chancellor found that those principles did not apply but dismissed the suit for other reasons. As we have already indicated, we do not find the grounds on which he relied to be sufficient. Thus we look at the alternative matters of claim and issue preclusion arising from the earlier litigation. Though the chancellor rejected this legal basis, we are to consider all legal issues de novo. Usually that only entails considering the reasons that were accepted by the trial court, but sometimes it is necessary to look at those rejected. Patel v. Telerent Leasing Corp., 574 So.2d 3, 6 (Miss. 1990)("if the judgment of such court can be sustained for any reason, it must be affirmed, and even though the trial judge based it upon the wrong legal reason.").
¶ 38. We briefly mention collateral estoppel, not because it is less important but because it is easy to contrast. "When collateral estoppel is applicable, the parties will be precluded from relitigating a specific issue actually litigated, determined by, and essential to the judgment in a former action, even though a different cause of action is the subject of the subsequent action." Dunaway v. W.H. Hopper & Associates, Inc., 422 So.2d 749, 751 (Miss.1982). Moreover, this doctrine applies "only to questions actually litigated in a prior suit, and not to questions which might have been litigated." Id. Thus the two preclusion principles are almost the same, except that collateral estoppel does not require the same cause of action, but it does require that the precise issue relevant to the second action was actually litigated in the first. This is usually referred to as "issue preclusion." The doctrine of res judicata, however, prevents a second lawsuit if the claims or defenses raised in the new one were available to the parties in the first actioneven if the claims or defenses were not raised. Id. That is called "claim preclusion."
¶ 39. The chancellor identified the common elements that must exist in a former and a present action before res judicata can bar the more recent one: (1) identity of the subject matter; (2) identity of the cause of action; (3) identity of the parties; and (4) identity of the "quality or character of a person against whom the claim is *855 made." Id. The chancellor rejected the doctrine because one action involved the two sons and others against their father, while the present action is between the two sons and various companies. We will examine this allegedly missing element first.
¶ 40. It is not necessary to have the identical parties in the two suits for this factor to be met. A defendant who was not a party in the original action "can assert res judicata if it is in `privity' with the named defendant." Russell v. Sun-America Securities, 962 F.2d 1169, 1173 (5th Cir.1992) (quoted in Little v. V & G Welding Supply, Inc., 704 So.2d 1336, 1339 (Miss.1997)). The Little court relied on this explanation of the doctrine:
Privity is a word which expresses the idea that as to certain matters and in certain circumstances persons who are not parties to an action but who are connected with it in their interests are affected by the judgment with reference to interests involved in the action, as if they were parties. The statement that a person is bound ... as a privy is a short method of stating that under the circumstances and for the purpose of the case at hand he is bound by ... all or some of the rules of res judicata by way of merger, bar or collateral estoppel.
Little, 704 So.2d at 1339 (quoting RESTATEMENT OF JUDGMENTS § 83 cmt. (1942)).
¶ 41. Applying that explanation, the court found that the action that it was reviewing was barred by res judicata even though the defendants were not the same as in the earlier suit. The plaintiff-decedents had been killed when an explosion occurred while they were welding. Their wrongful death beneficiaries's federal suit against the propylene gas manufacturer (Chevron) and the bulk distributor of the gas (Liquid Air Corporation) was dismissed on summary judgment. The federal court found no evidence of a defect in the product or a failure to warn that would support the product liability action. Little v. Liquid Air Corp., 37 F.3d 1069, 1079 (5th Cir.1994). While that appeal was pending, the same plaintiffs brought a state court wrongful death action against the downstream distributors of the gas, Mid-South Oxygen Company and V & G Fire Extinguisher Service, Inc. Both of these defendants filed third-party complaints against Liquid Air, alleging that it must indemnify them for any liability that might be imposed. The supreme court agreed that there was sufficient privity for res judicata purposes between Mid-South and V & G, parties who were subsequent in the chain of distribution involving the propylene gas, and the two defendants in the first suit, the manufacturer and the bulk distributor. Little, 704 So.2d at 1337.
¶ 42. Turning now to our case, we reiterate that Mack McCorkle, Sr., has been found to have no liability to the plaintiffs Donald and Mack McCorkle, Jr., for the sale of the timber to the defendants. The chancellor held that until the two sons exercised their rights under the 1972 Agreement, Mr. McCorkle, Sr., could use the property as he saw fit. The defendants are in privity with Mr. McCorkle, Sr., having entered the contracts either directly with him or with his contractor that led to the disputed cutting. Indeed, just as in Little, the defendants might well have an indemnity action against Mr. McCorkle, Sr., if they were found in this suit to have contracted with the wrong person. The failure of any of the family member parties in the first suit to appeal that judgment cannot bind the timber company defendants on the indemnity issue in this case.
¶ 43. Thus we find identity of parties between the two suits. We turn to the other factors.
¶ 44. The subject matter of the two actions is the same. It is the contracts that Mr. McCorkle, Sr., entered with the defendants for the estimation of value and then the cutting of the timber.
*856 ¶ 45. The cause of action is the same. The two sons here complain of the conversion of the timber. In the first suit they complained about the seller's role in that conversion; in this suit they complain about the buyers' role. The sons argue that they only sought statutory damages in the first action. We disagree, as they sought an accounting, requested that "a judgment be granted ... for any and all timber that was removed," and in addition sought statutory and punitive damages. Regardless, under claim preclusion any claim that they could have made in the prior action is barred in a later one.
¶ 46. To resolve either suit, a court must determine the right of Mr. McCorkle Sr., to sell his timber to these defendants without the need for permission or to share the proceeds with the two sons who had contractual rights under the 1972 Agreement. For the sons to succeed in this suit after the father succeeded in the first suit would be incompatible results.
The usual test for determining whether the cause of action in the two suits is the same is to ascertain whether the evidence necessary to maintain the one would authorize a recovery in the other. If not, the prior judgment is not a bar to the second.
Tobias v. Tobias, 225 Miss. 392, 398, 83 So.2d 638, 640 (1955) (quoting Hardy v. O'Pry, 102 Miss. 197, 59 So. 73, 75 (1912)). The evidence would be the same in the two suits: proof of the Agreement and its meaning, the actions of the father despite the Agreement, the actions of the present suit defendants in cutting the timber, and the value of the timber for which recovery is sought.
¶ 47. The final requirement is "identity of the quality in the person for or against whom the claim is made." That is an odd phrase. The earliest reference discovered to that element is in Creegan v. Hyman, 93 Miss. 481, 493, 46 So. 952, 954 (1908) (quoting 24 Am. & Eng. Ency. of Law, p. 778). It just means that if someone is appearing in some limited or representative capacity in one case and personally in the other, that party's "quality or character" is not the same in the two actions. For example, what a party did in litigation as the executor of an estate to which he has fiduciary responsibilities should not necessarily bind him as an individual defendant. The defendant on the counter-claim was the father, individually, as the contracting party in selling the timber. The defendants here are the companies with which he was in privity. The character of the defendants is the same in both suits. See Little, 704 So.2d at 1339.
¶ 48. Therefore, of the two causes of action that we identified as still alive after the judgment on the pleadings, the claim for damages against these defendants, who were in privity with the counterclaim defendant in the first suit, is barred by res judicata. The claim for tortious interference with a contract is one that could not have been raised against Mr. McCorkle, Sr. The allegation may be that the timber company defendants in some manner improperly encouraged Mr. McCorkle, Sr.'s 1994-1995 refusal to perform his obligations under the 1972 Agreement. It is true that until the option was exercised the father had the right to sell his timber without sharing the funds with anyone. However, the timber companies could not tortiously interfere with the sons' exercise of their option rights. It is a bare claim at this stage, without any supporting facts. Thus we do not know what if anything might support the cause of action. That is to be sorted out on remand, since the judgment that we are reviewing was on the pleadings.

II. Standing
¶ 49. The chancellor also dismissed the complaint for lack of standing. Mississippi's requirements for standing are few. Fordice v. Bryan, 651 So.2d 998, 1003 (Miss.1995). Parties have standing to sue or intervene when they assert a colorable interest in the subject matter of the litigation or experience an adverse effect *857 from the conduct of the defendant, or as otherwise authorized by law. Dunn v. Mississippi Dept. of Health, 708 So.2d 67, 70 (Miss.1998).
¶ 50. Here the McCorkle sons had at least contractual rights and arguably an interest in property at the time the timber was being harvested. The May 25, 1995 judgment recognized that they had rights that could be exercised only upon tendering the purchase price referenced in the 1972 Agreement. Though this was not done until August 1995, at which time the timber harvest had been completed for approximately one year, it appears that they tried to exercise the rights earlier. Their father refused to recognize the validity of the Agreement and the first suit was then necessary.
¶ 51. The courts of Mississippi exist to provide a person a remedy "for an injury done him in his lands, goods, person or reputation." Miss. Const. art 3 § 24. Here there is an injury alleged to the McCorkle sons personally. Accordingly the trial court should not have dismissed their complaint for lack of standing except to the extent the standing was lost because of res judicata. We hold that this is not an independent basis to rule in this case.

Conclusion
¶ 52. We reverse the dismissal of the complaint for failure to state a claim for tortious interference with a contract. The complaint should have been held sufficient to withstand that objection. Whether evidence exists to prove that claim is still to be shown.
¶ 53. The pleadings on their face indicated that res judicata was a proper basis for judgment on the remainder of the claims. Therefore we are agreeing with their dismissal, but on legal grounds different than the ones found by the chancellor.
¶ 54. THE JUDGMENT OF THE AMITE COUNTY CHANCERY COURT DISMISSING THE CAUSE OF ACTION FOR TORTIOUS INTERFERENCE WITH A CONTRACT IS REVERSED AND THE CAUSE REMANDED FOR FURTHER PROCEEDINGS. THE JUDGMENT IS AFFIRMED IN ALL OTHER RESPECTS. COSTS OF THIS APPEAL ARE ASSESSED ONE-HALF TO THE APPELLANTS AND ONE-HALF TO THE APPELLEES.
McMILLIN, C.J., KING, P.J., BRIDGES, IRVING, LEE, MOORE, PAYNE, AND THOMAS, JJ., CONCUR.